Good morning, your honors. Thank you, and may it please the court and opposing counsel. My name is Charlie Alden, and I represent the appellants in this matter. This case presents the important question of whether persons who are civilly committed for treatment for sexual disorders are entitled to a minimum wage for the work they perform in maintaining the facilities and the work they do in making signs in the Minnesota State Industries sign shop. As the court is familiar, depending on the phase of treatment in which they are currently participating, patients or clients at MSOP have between 50 to 25 percent of their minimum wage withheld by the Department of Human Services, and individuals in community preparation services, which is the final phase of treatment, receive the full minimum wage. This wage withholding is done under the authority of the Department of Human Services, but is actually effectuated by MSOP. In its summary judgment order, the district court failed to follow Supreme Court precedent on two fronts. Both require reversal of the district court's decision and entry of summary judgment in favor of the plaintiffs under this court's de novo standard of review. First, the district court erred in analogizing plaintiffs' work for MSOP within the context of the vocational work program to work performed by prisoners who have the right to have their work compelled from them involuntarily under the 13th Amendment. In following this line of reasoning, the district court reversed course from the determination that recommendations had made at the motion dismiss stage, where the magistrate judge, quote, declined the defendant's invitation to rule that MSOP detainees are categorically beyond the reach of the FLSA because they're essentially prisoners who are not covered by the FLSA. That's at page 166 of the appendix. The report and recommendations which were adopted in full go on to say that this method of comparison was rejected by the court in 2011 in the case Martin v. Benson. But at the summary judgment stage, the district court did no more than compare plaintiffs to prisoners, citing a case Villareal v. Woodham from 1997 from the 11th Circuit involving prison labor and Cody v. Hillard, a decision from 1987 in this court involving pretrial detainee labor. The district court's approach was out of step with U.S. Supreme Court precedent and with other courts that have considered the question of whether persons institutionalized for rehabilitation or treatment are entitled to a minimum wage. Other courts have recognized based on... Counsel, please, I'm concerned about the U.S. Supreme Court because I think all the circuit courts are against you that have ruled on this, the three or four that have ruled on it. So tell me which Supreme Court case supports your position. Well, first to that point regarding the other circuit, the opinions in other circuit courts, it is important to acknowledge that this case is the first in which any person civilly committed for sex offender treatment has been represented by an attorney. It's the first case to survive a Rule 12 motion to dismiss. And if you look at our citations, both in our summary judgment briefing and in the footnote in our reply brief, we talk about the fact that in those six or seven cases, in most cases, the Fair Labor Standard Act was not even mentioned by name. So we are dealing with a situation here, which I'll acknowledge, where we have a lot of bad law that's come about because people have represented themselves pro se. This is the first case in which a court, other than the district court here, will be presented with the correct, accurate legal argument, which involves, as we've cited in our brief, the Tony Alamo versus U.S. Secretary of Labor case from 1985, which stands for the proposition that in an institutionalized environment, if work is performed with the expectation of compensation, it is FLSA employment, full stop, period. And it doesn't matter, according to the Alamo case, and as well, according to earlier cases like Souter v. Brennan from 1973 in the U.S. District Court for the District of Columbia and the Weidenfeller v. Cadoula's case. Well, now, Alamo is completely different, because there, of course, the people put themselves in. You may know the facts of it. Most of the basic facts come from our circuit, though the case didn't. And there the people themselves voluntarily did it. And that was the real issue in that case, is whether the fact that they were so voluntarily underpaid the minimum wage. The Supreme Court, as you know, said no. So tell me how that relates to this case, where these people are involuntarily committed. I don't think it—well, for one, according to the regulations promulgated by the U.S. Department of Labor, if you look at section 5.3b of the Code of Federal Regulations, those regulations were promulgated by the Department of Labor in 1986 under authority delegated to the department by Congress. They specifically say in those regulations that the circumstances of an individual's confinement, whether voluntary or pursuant to a court order, does not matter in determining whether an employment relationship exists. Going back to Alamo— Now, it can't be a flat rule, because the Supreme Court talked about it for 20 or 30 pages. So help me what—help me orient what you just said. Go ahead. Do you mean the Alamo court? Yeah, the Alamo court, yes. The Alamo court, that decision was from 1985. So these regulations were promulgated the next year. But I would take issue with there being any distinction between persons being voluntarily committed versus involuntarily committed. I don't think that matters from the perspective of Alamo, and here's why. Because first of all, the rule of law from Alamo is that what determines the existence of an employment relationship is the expectation of compensation. And it doesn't matter whether it's an alleged rehabilitative environment or the people are there for treatment of various disorders. I believe the Supreme Court categorized some of the people in language. But in any case, there's no indication from Alamo that it matters that the individuals are there performing work voluntarily. What matters is whether they have an expectation of compensation. And that is just the rule of law. And then importantly, as we cite in our principal brief, beginning on page 9, and then in our reply brief beginning on page 21, we go through all the cases that have cited Alamo for that exact same proposition. And in those cases, in most of them, I don't believe there's a single one of those cases where those people are institutionalized voluntarily. Instead, in most cases, they've been institutionalized in lieu of a prison sentence. And similar, in fact, identical to the plaintiffs in this situation, they don't have any options with respect to who their employer is. They're not operating in the and that's identical to the circumstances of this case. And this is why we argue, and I believe it to be the case, that persons who are civilly committed for sex offender treatment have indisputably been subjected to a narrow carve out with respect to their civil rights under the Fair Labor Standards Act that has no justification in law. And with that, I want to move to the second point, which is a point that the district court failed to address at all. And I think I can say objectively, and I think you'd agree that the district court didn't address any of plaintiff's arguments, didn't mention the Alamo decision, didn't refer to the U.S. Department of Labor, didn't refer to the Auer v. Robbins decision by the U.S. Supreme Court that says you have to defer to the guidance of the agency tasked with interpreting and enforcing the Fair Labor Standards Act, which is the U.S. Department of Labor. And here, in the context of patient workers, the U.S. Department of Labor has said, again, in the regulations it promulgated in 1986, under authority delegated to it by Congress, it said that this exact situation that the plaintiffs are in here, in MSOP, is the type of situation that results in FLSA employment. And the only rejoinder... Well, counsel, let me try another distinction on you. You know that a lot of the other courts go custodial. They say this is a custodial, not a bargain for, not a free market sort of deal, because it's custodial. And they use that word quite often. Why isn't this clearly custodial and therefore not within FLSA? Well, if it is custodial, if that's the case, Your Honor, then nobody who's institutionalized at the Minnesota Security Hospital because they are chemically dependent, mentally ill, mentally ill and dangerous, physically infirm, none of those people, if the court affirms the district court's decision, are entitled to a minimum wage either. And that's clearly out of step with U.S. Department of Labor regulations. Because as I've made this point many times and the district court failed to grapple with it, for the state's part, all they say is, well, these folks aren't patient workers. Well, that's not the point. Anybody who's civilly committed in the state of Minnesota is civilly committed to a supervised living facility, all right? And as the judge, as Judge Thunheim mentions on page 13 of his opinion, he says, well, plaintiff's basic needs are provided for by the state because they're in a supervised living facility. They get food, bedding, linens. Now, putting aside the fact that we took up to approximately 40 depositions in this case, we made all of the arguments necessary under the motion to dismiss standard as to what sort of basic needs might suggest an employment relationship. Judge Thunheim didn't touch any of that. He merely deferred to the Minnesota administrative rules on supervised living facilities at page 13 of his opinion and said, hey, it looks like the state is providing for a lot of what one might consider basic needs. Therefore, this isn't a traditional employment relationship. The problem with Judge Thunheim's analysis is he didn't take the next logical step, which we asked him to do. He avoided it entirely. The point being that people who are regarded by the Department of Labor under the regulations they've promulgated, which we set out in detail in our briefing, who are, again, chemically dependent, developmentally disabled, old and infirm, have cerebral palsy, mental retardation, all of those people are considered patient workers and then are entitled to a federal minimum wage and indeed are being paid a federal minimum wage. But all of those people also are required to be, if they're under state care, in supervised living facilities that are the exact same supervised living facilities in terms of the sorts of things that they must provide to the people whose custody and care they're providing for as the plaintiffs in this action. So we are really comparing apples to apples. But somehow, because of the fact that these individuals have represented themselves pro se and these arguments have never been advanced, we are currently dealing in an atmosphere where we've got incorrect law on this issue. For instance, in the Martin v. Benson decision in 2011, the Martin court, Judge Keyes, attempts to draw a distinction between plaintiff workers and persons who are civilly committed as sex offenders when we all know that the only difference between these individuals is the reasons they were committed in the first place. That's the only difference. And somehow, this is supposed to change the economic reality of the relationship to the state. So I think the biggest oversight, there were many in the district court's opinion, is failing to recognize that if the district court doesn't want to acknowledge the binding effect of the Alamo decision from 1985 and doesn't want to rule in accordance with all the courts that have followed Alamo, and it wants to instead use its, I consider it to be a subjective economic reality test, which by the way, that phrase has only been used in the Eighth Circuit with the exception of the Barnett v. Young Men's Christian Association unreported decision, that economic reality has only been used to determine whether there's an independent contractor relationship. So that also has come out of the blue in this history of legislation, of jurisprudence over this issue. But the point, the ultimate point is that if the district court wanted to ignore Alamo and then make up its determination as to what this economic reality looked like, how can it not then look to persons who are civilly committed to supervised living facilities for any other reason, and we know that those persons are entitled to a minimum wage because they're patient workers under Department of Labor standards, how can it not make that next leap? The only reason that I can conclude is the initial reason for the commitment, because these people, even the nomenclature with which we refer to them, civilly committed sex offenders, that's not what they are. They're persons civilly committed to the state for treatment of sexual disorders. They've been subjected to a narrow carve out with no basis in law, or in fact, the district court refused to acknowledge any of plaintiff's arguments. I'll try to reserve one minute for rebuttal. I'll just last say that on the portable photo op issue, that analysis was so lacking, it's simply emblematic of the district court's failure to address any of plaintiff's arguments, and I'll reserve the remaining time. Thank you. Very well. Ms. Lander? Thank you. May it please the court, your honors, the fundamental question before the court today is a simple one. Are persons receiving vocational programming in an involuntary custodial setting employees of the state of Minnesota, as that word is defined by the Fair Labor Standards Act? The circuit courts to address this question have answered it in unison, and the answer is no. Well, counsel, is your opponent, is the other side correct that none of them had attorneys? I'm surprised at that in these circuit courts that none of them had attorneys. Tell me the extent to which that's true and not true. Your honor, I believe that to not be true entirely. It is true that for some of the I believe there was at least one party that had representation, and certainly on appeal, you can see when you look at the published opinion that the parties appear to have been represented for purposes of the appeal. But regardless, whether or not these individuals were represented or not does not change the fact that the First Circuit, the Fourth Circuit, and the Seventh Circuit have held that the FLSA does not apply as a matter of law to persons who are civilly committed to receive sex offender treatment. Let me interrupt you to say please address the Alamo decision, because as you know, very similarly, the people there, due to their religious faith in Alamo, said they wanted to come there and they wanted to be rehabilitated. They wanted to be taken care of. They wanted all the same kind of benefits, kind So how do you distinguish it so easily? Absolutely, your honor. Well, first of all, the decisions that we cite from the Matt, so Matherly, Miller, and Sanders all were, came down after the Alamo case, and as a result have distinguished it, and it is clearly distinguishable. Counsel, I keep saying Alamo because I've heard him. He does say his name a lot and always has. Absolutely. Sorry. But that's not important. What is important is, but who's the best one that addresses the Alamo case? Who's the best one that addresses it? That, honestly, your honor, I don't remember off the top of my head, but I can distinguish the case having familiarized myself with it for the purposes of this argument, number one. Which is the best that distinguishes Kansas versus Hendricks? Well, the United States Supreme Court said this sort of arrangement is not punishment. It's not like a prison. They went to great lengths to say that, to let it be, and I'll use the word indefinite. So what court does the best job of distinguishing the Hendricks case? Well, first of all, the Hendricks case, your honor, is not a Fair Labor Standards Act case. Oh, I understand that. I understand that, but I also understand the central premise of it, too. So go ahead and tell me, tell me what's, I'm looking for help. Which, which of those are the best that distinguish? Well, so your honor, all of the cases that we have cited have, have wrestled with this idea. And I think the way that plaintiff's counsel has described it is that prisons who are involuntarily civilly committed for sex offender treatment are not there for punishment. And that is absolutely correct. MSOP clients are not there to be punished. They are there for treatment. And despite that distinction between cases in the prison setting, as opposed to the involuntarily civil commitment setting, circuit after circuit after circuit have held that because the custodial environment is fundamentally different. And we're not just talking about the first, fourth, and seventh circuit, your honor. We're talking about the ninth circuit in the rehabilitative center context. We're talking about the fifth circuit in Alvarado versus INS in the immigration detainee context. We're talking about Villareal and Wilhelm. That's an 11th circuit case where a pretrial detainee who is not there to be punished, it was held that the AFLSA does not apply. And all of these cases, your honor, what they come down to and what the courts look at are the fundamental purposes, the reasons behind the minimum wage requirement under the AFLSA. And those are two things. One, to ensure a minimum standard of living for employees. And two, to ensure that there is no unfair competition in market. And that's why the custodial setting is fundamentally different, your honor, because as a matter of law, viewing any custodial environment, whether it's criminal, civil, immigration, or otherwise, if it's an involuntary custodial environment, those things are satisfied. In this case, as a matter of law, even just looking at the statutes that are set forth under Minnesota law, number one, clients have a basic standard of living guaranteed to them as a matter of law, which plaintiffs admitted below. If it were that MSOP were not to comply with those requirements, plaintiffs would have a 1983 action under the 14th Amendment. So there's another remedy to the extent that they believe that they aren't having their minimum standard of living provided for, but regardless, the summary judgment record is clear as a bell that in fact their minimum necessities were in fact satisfied. And then number two, the Minnesota vocational, the vocational work program does not interfere with the market, and that's because as a matter of law, it cannot. It cannot engage in interstate commerce. It cannot contract with other governmental entities. It cannot utilize... Doesn't at least some of the work that's being done displace state workers? Yes and no, Your Honor. What plaintiffs have argued in their briefing is that the vocational work program, some of the placements that are provided is work that is fundamental, or not fundamental, but that is necessary for the operation of MSOP. But of course, that's true in the prison setting as well, and all of the cases that we've cited from all of the circuit courts. And what they've held is that it is different when that vocational programming that the purpose is different. The purpose isn't to make money. The purpose is to provide in the prison setting rehabilitation, and in the MSOP environment, it's to provide treatment. And that's as a matter of law. MSOP is required as a matter of law to provide programming that serves as treatment, and that's exactly what it is. It cannot be disputed that the MSOP vocational work program is treatment, because the experts have spoken in unison on this, and plaintiffs have not presented that. And that's a key factor that the courts have looked at, both in criminal detention as well as civil detention. What's the purpose of the vocational programming? Is it a business purpose, as we would see in the traditional environment, or is it a rehabilitative purpose? Is the purpose in order to provide some structure to their day, in order to reduce idleness, in order to provide differences, is what causes this to be different. And the most important case for your honors to be looking at and making a decision in this case is the McMaster case. That is a 1994 case that came out after OMO, if I'm pronouncing that correctly now. And in that case, this court held with a very high-level analysis that prison labor is not employment under the FLSA. And in that case, the court relied strongly on the two purposes underlying the Fair Labor Standards Act. And it's important, your honor, to talk about plaintiff's argument about this test that they believe exists, that FLSA employment exists if there's an expectation of compensation and there's any nominal benefit to the custodian whatsoever. Because if that's the test, your honor, McMaster was wrongfully decided. In McMaster, those prison inmates did expect compensation. They received, I believe, 40 cents to 50 cents an hour. So they absolutely expected compensation for their work. And the goods in that particular case were sold in the market. So arguably, there was some benefit coming to the prison. And yet, the court held that the FLSA does not apply because of these high-level reasons, because their basic standard of care is provided for by the prison. Interestingly enough, plaintiffs have relied strongly upon the MSI Sign Shop, which is a small portion of the Minnesota State Industries, which is itself a small portion of the Vocational Work Program. That program was purchased from the Department of Corrections. So in 1994, that exact program, the Sign Shop, was exempt from the FLSA. It was purchased by MSOP to provide opportunities. And oftentimes, your honor, is correct. They might be performing cleaning. They might be doing cleaning and kitchen work. But MSOP also affirmatively provides vocational opportunities to clients that they don't need. One example that we highlighted in our briefing was a condiment handing out position. They have hired someone to sit in the kitchen and hand out condiment packets because that was a vocational option that would assist him in progressing on his treatment. It was absolutely unnecessary for the operation of the MSOP kitchen, and yet it was created. And that is in line with the statutory purpose of the programming. Counsel, you're not advocating we take a function-by-function approach and position-by-position and shop-by-shop. Are you advocating that? No, absolutely not. And that's actually why, in the alternative, we argue that if summary collective actions should be decertified. Because some of the factual questions that plaintiff is raising only demonstrates that if this court were to find some of his factual allegations to be material, which they are not, it would mean that the class would have to be decertified because the fact pattern would be different for every single client. Because every client's placement is different. There's two different facilities here, your honor. There's numerous placements. There's numerous intersections between the placement and their treatment. But what the detailed factual record did show, that I don't believe that this court actually needs to resolve at all to resolve this pending appeal, but if this court were to dive into the factual record, you would see that this program has been developed painstakingly to ensure that every aspect of it is treatment-oriented instead of being business-oriented. And that's why the program doesn't make money. Instead, it's multifaceted treatment that's provided at every point. Every single employer has to provide housing, clothing, free laundry services, food, et cetera. So those, it's just a fundamentally different environment. A helpful case, I think, for your honors with regard to applying this economic reality test, which is the test in this case as a matter of law under the McMaster case, is the most recent Fourth Circuit case, Nadambi v. CoreCivic, that's 990F3369. It's helpful because it's the most recent case, your honors. It's also helpful, and I think it goes to your question, Judge Benton, this is not a criminal case. This is a case addressing civil detention prior to removal. So these are individuals that are being detained, not as punishment, but to ensure that they are there for purposes of a removal proceeding. And in that case, the court addressed the vast majority of the arguments that plaintiffs are presenting in this case, addressed and rejected them, citing McMaster and also engaging in a high-level economic reality analysis, obviously prioritizing the fundamental nature, the fundamental difference between a custodial environment and a non-custodial environment. In that case, it was a voluntary work program, so that's the same as it is at MSOP. The plaintiffs argued in that case that they had to perform work necessary for the facility, cleaning work, etc., and the court said that that does not eliminate the non-pecuniary goals of the program, which was rehabilitation, which was to ensure that there's good population management for purposes of persons who are detained. It also addressed and rejected plaintiffs' basic necessities arguments, stating that any potential inadequacy of conditions is not appropriately remedied by applying the FLSA. Instead, it would be appropriately analyzed by a 1983 action. So for all those reasons, Your Honor, this court can and should, under McMaster, apply a very high-level analysis here in finding that the custodial environment is a significant difference that requires that the FLSA not be provided or not be applied. But in the alternative, if this court was to dive deep into this factual record, and there is a large factual record that the district court considered in this case, that factual record demonstrates that the vocational work program is not employment as a matter of law. Assuming all the facts in the favor of plaintiffs, it would still border on the absurd to categorize the vocational work program as employment under the FLSA. And that's for these six reasons. Number one, the vocational work program does not make money, it is never made money, it is entirely reliant upon taxpayer dollars every year to work. Number two, by statute, this program must serve as treatment. It has to be provided to MSOP clients, and it must be treatment. Three, there are numerous statutory limitations on the vocational work program such that it could not interfere with the market more generally speaking, and those as a matter of fact, it is undisputed that MSOP does not engage in interstate commerce and does not work with the private sector. Number four, there is no bargain for exchange here. There's too much control that MSOP has over clients to consider it to be a employer-employee relationship, it's a custodial relationship, and MSOP has 100% control over the placements. Number five, there is no competitive hire fire. MSOP does not place individuals based off of their work background. They place individuals based off of their treatment needs, manufacturing placements in order to meet those needs. And six, a basic standard of living is guaranteed, and there is no facts in the record to indicate that any MSOP client has ever gone without anything. So for all these reasons, your honor, we ask that the court affirm the district court's opinion. Thank you, Ms. Landrum. Mr. Olden, I believe you reserved about a minute. Yep, should have asked for 20 as it turns out. Well, everything that Ms. Landrum just said also applies to anybody who's civilly committed for any other reason in the state of Minnesota. That's the first thing I'll say. Clearly, state-run hospitals and supervised living facilities are not profit-making enterprises, and I don't know what it means to compare something to a traditional employment relationship. Nonprofit governmental institutions and state agencies can be employers. And most importantly, I'll go back to it again, but the patient workers who are deemed by the Department of Labor, by the Martin Court, and in the text of the FLSA itself, they are considered to be presumptively entitled to a minimum wage. And all of these things, treatment, basic needs, et cetera, under the rules for supervised living facilities, they must be provided to both groups. So in terms of the respect to both, and Department of Labor guidance is controlling. So thank you for your time and thanks. Thank you, counsel. The court appreciates your appearance and arguments and briefing. Case will be submitted and we'll issue an opinion in due course. Thank you.